Argued October 28, 1952, reversed and remanded March 4,
petition for rehearing denied April 29, 1953

# SWEET ET AL. *v.* IRRIGATION CANAL CO.

254 P. 2d 700
256 P. 2d 252

*Charles R. Cater,* of La Grande, argued the cause and filed a brief for appellants.

*George T. Cochran* argued the cause for respondent. On the brief were Cochran & Eberhard, of La Grande.

Before BRAND*, Chief Justice, and ROSSMAN, LUSK, LATOURETTE** and WARNER, Justices.

LUSK, J.

Plaintiffs brought this suit as an abutting owner to obtain a decree enjoining the maintenance by the defendant of an irrigation ditch in a county road as an open ditch which interferes with the plaintiffs' right of ingress and egress to and from their land.

Defendant, in its amended answer, denies that the

---

* Chief Justice when this case was argued.
** Chief Justice when this opinion was rendered.

ditch is in the county road, and sets up certain affirmative defenses which may be summarized as follows: (1) Adverse possession. Defendant alleges that the ditch was constructed in April, 1937, upon lands belonging to plaintiffs' predecessors in interest, who, for a valuable consideration paid to them by the defendant, granted to the defendant an oral right of way to construct and maintain such ditch over said lands, and that ever since April, 1937, defendant has owned and operated said ditch for the transportation of water to water users openly, notoriously and in full view and under a claim of right, and that it was so owned and operated at the time plaintiffs acquired an interest in the premises, as the plaintiffs well knew. (2) Estoppel, based upon the fact that plaintiffs, after they acquired the land with such knowledge, changed the use of it by engaging in a business to which the public is invited. (3) A counterclaim for damages based upon plaintiffs' alleged unlawful obstruction of the waters of the ditch by building a culvert across it. (4) Written consent of Union County to the construction of said ditch.

After a hearing the court entered findings of fact and conclusions of law and a decree in favor of the defendant. Plaintiffs appeal. By its fifth finding of fact (which is evidently the basis of the decree) the court found that the plaintiffs had failed to prove that a common boundary exists between the county road and the plaintiffs' property. Whether that finding is correct is the vital question in the case because, if plaintiffs' premises do not abut on the county road, they have no standing to maintain this suit.

Plaintiffs acquired their land by warranty deed dated June 13, 1946, executed by Bernard W. Wise and

wife and containing the following description of the premises conveyed:

"Beginning at the southeast corner of Lot 1 of block 73 in Riverside Addition to La Grande, Union County, Oregon, and running thence north 88° 49' west along the north line of the alley in said block, a distance of 200 feet to the north line of the old county road; thence following the north line of said old county road north 68° 23' west 189.45 feet to a point 592.42 feet north and 1320.0 feet west of the southeast corner of southwest quarter of section 31, in township 2 south, range 38 east of Willamette Meridian; thence continuing along the north line of said county road north 70° 43' west, 333 feet; thence north 30° 34' west 150.2 feet; thence north 1° 11' west 47.24 feet to the center of the channel of Grande Ronde River; thence north 70° 54' east along said river channel, 475.0 feet; thence south 1° 11' east 163.0 feet; thence south 89° 22' east 138.2 feet; thence south 45° 21' east 87.7 feet; thence south 79° 59' east 111.0 feet; thence south 1° 11' east 270.5 feet to the place of beginning.

"Containing 5.30 acres, more or less, and situated in the SE ¼ of SW ¼ and in the SW ¼ of SW ¼ of section 31, township 2 south, range 38 EWM.

"Being the same premises conveyed by L. J. Walls and Millie Walls, his wife, to Bernard W. Wise and Nancy G. Wise, his wife, by deed dated October 22nd, 1942."

Roughly, the deed describes a tract of land triangular in shape, bounded on the north by the Grande Ronde River and the southwesterly line of which is "the old county road," which is the road in dispute.

In addition to this deed there are in the record the following instruments: Deed from Grande Ronde Meat Company to Elizabeth Bushnell dated December 2, 1935; deed from E. N. Bushnell to L. J. Walls et ux

dated April 23, 1941; deed from L. J. Walls and wife to Bernard W. Wise and wife dated October 22, 1942. These are all general warranty deeds. There is also in evidence a quitclaim deed from F. A. Epling and wife to W. H. Sweet and wife dated June 13, 1946, being the date of the deed executed by Bernard W. Wise and wife to the plaintiffs. These deeds are in the chain of title of the premises in question, and all describe the land as *bounded on the south by the old county road* with the exception of the quitclaim deed from the Eplings to the plaintiffs, which contains as a part of the description the following:

> "Beginning at a point on the North line of the old county road 592.42 feet north of the southeast corner of southwest quarter of southwest quarter of section 31, in township 2 South, range 38 east of Willamette Meridian; thence along the north line of said old county road north 70° 43′ west a distance of 333 feet."

By reference to the description in the deed from Wise and wife to the plaintiffs it will be seen that, beginning at the southeast corner of block 73 in Riverside Addition to La Grande, the southerly line of the tract runs west 200 feet to the north line of the old county road, thence it follows the line of the old county road in a general northeasterly direction a distance of 672.25 feet, thence north 47.24 feet to the center of the Grande Ronde River. A bridge known as the Orodell bridge spans the river near the west line of plaintiffs' property, the distance from the middle of the bridge to plaintiffs' line being 30 feet.

The accompanying sketch illustrates the *locus in quo* except that it does not show the beginning point in the description in plaintiffs' deed and shows only a part of the first course. The small circle marked

I. P. near the circled 73 at the right-hand side of the map indicates an iron pipe placed there by S. B. Morgan, county engineer, road master and official sur-

veyor for Union County, in April, 1946, when he surveyed the premises. This pipe marks the change from the first course to the second one, to wit, "thence following the north line of said old county road north 68° 23′ west 189.45 feet", etc.

Southwesterly from plaintiffs' land, and roughly paralleling it for a distance of 500 feet or more, is the right of way of the Union Pacific Railway. The right of way widens as it approaches the city of La Grande to the east, bringing the northeasterly line thereof 20 feet nearer to plaintiffs' southwesterly property line. Distances between the parallel lines of plaintiffs' property and the right of way vary from approximately 65 to 100 feet.

In 1894 proceedings were instituted to establish a county road to commence at the south end of the Orodell bridge and run in a southeasterly direction along the north side of the right of way of the Oregon Railway and Navigation Company (now the Union Pacific Railway) to the west corporate limit of the city of La Grande at a definitely located point, such road being approximately half a mile in length. This road would have run between the railroad right of way and plaintiffs' land. It is practically conceded that, owing to defects in the proceedings, they were ineffectual to establish a road. Plaintiffs claim, however, that the road was established by prescription under color of title of the void proceedings and to the full statutory width of 60 feet, and that the exterior northeasterly line is the southwesterly line of plaintiffs' land. Defendant does not deny the existence of the road and could not well do so because the evidence shows, without contradiction, that for many years in excess of the prescriptive period (which is 10 years in this state: § 1-202, OCLA), such a road, leading from the Orodell

bridge and passing between plaintiffs' property and the railroad right of way, has been used by the general public and has been improved and kept up by the county. But the width of the highway so used and improved—the graveled portion—is approximately only 25 feet. It is designated "County Road" on the map, between the broken lines which indicate the exterior boundaries of the improved highway. The northeasterly boundary of the graveled portion at no place touches the southwesterly line of plaintiffs' land, but is south of it, the distance varying from 25 to 30 feet. Defendant's irrigation ditch, which was constructed in 1937 under circumstances to be later detailed, is located in this strip between the plaintiffs' land and the road as improved and used. It is defendant's position that such user determines the width of the road.

1. The contention that its width may be determined by reference to the ineffectual proceedings for the location of a road may be at once laid out of view. It is true that such proceedings are "evidence of color of title, and that a subsequent user by the public of the road attempted to be located, for the statutory period, if begun and continued with reference to the proceedings of the county court, is proof of a legal highway, the full width designated in such proceedings." *Nosler v. Coos Bay R. R. Co.*, 39 Or 331, 334, 64 P 644; *Bayard v. Standard Oil Co.*, 38 Or 438, 447, 63 P 614. But, as stated in the Bayard case:

> "* * * Colorable title forms the basis upon which a prescriptive right to the full width of the defined limits is founded. The next step in logical course of establishment is an entry and a user with reference to it, and, when this has been continuous and uninterrupted and adverse for the statutory period, then has the right ripened into a valid title

in the public. It would be fallacious reasoning, therefore, to indulge a presumption that a road as actually worked and used by the public was within and upon the way as attempted to be located, and thence to conclude that its width must be measured by that designated in the void proceedings. It must be proven that the road as used falls within the colorable title, and, when this is done, the other condition follows; that is, the possession is extended constructively to the entire designated width, or occupancy of a part is then equivalent to an occupancy of the whole. Where the highway as used runs without the exterior lines of that as surveyed and attempted to be located and established by lawful authority, the width must then be determined by the rules hereinbefore ascertained, and the ineffectual proceedings can have no bearing whatever upon the subject.''

As the evidence in the Bayard case failed to show that the road, as used at the particular point involved, was within the exterior limits of the road as attempted to be laid out at that point, it was held that the ineffectual record was not pertinent or competent and should not have been allowed to go to the jury. In the present case the record of the proceedings for the location of a road consists only of the petition and the order of the county court setting forth a copy of the report of the viewers and surveyor, and directing that the report be approved and adopted by the court, that the proposed road be declared a public highway of Union County, Oregon, and ordered opened up and placed in repair for travel according to law. It was further ordered that the report of the viewers be placed on record, and that the surveyor's plat of the proposed road and his field notes of the survey thereof be placed on record. If these things were ever done, the evidence does not so disclose, and there is no way to determine

the exterior limits of the road attempted to be established. Hence, under the decision in the Bayard case, the proceedings do not constitute evidence of color of title and are no basis for application of the rule invoked by the plaintiffs.

■ The question, however, is one of fact *(Bayard v. Standard Oil Co.,* supra; *Silverton v. Brown,* 63 Or 418, 128 P 45; *Montgomery v. Somers,* 50 Or 259, 90 P 674), and there is additional evidence bearing upon it which must now be considered.

As already stated, five deeds conveying all or a part of plaintiffs' land indicate that its southwesterly boundary is the county road. The evidence shows that for more than 25 years a fence has been maintained along the southwesterly line in approximately the same position as the present fence, which is on the southwesterly line as surveyed by the witness Morgan. It is a fair inference from the evidence that both the county officials and the officers of the defendant company considered that the land on which the irrigation ditch is located is a part of the county road. Before April, 1937, the defendant's irrigation ditch extended from the Grande Ronde River about a quarter of a mile easterly from the Orodell bridge, and thence through the city of La Grande to the lands to which the company supplied irrigation. Lowering of the river made it necessary to move the point of intake to its present location slightly west of the Orodell bridge. Certain arrangements with the city, not material here, were made for moving the ditch, and a permit was obtained from the county court which reads in part as follows:

"WHEREAS, said company has caused a survey to be made for a new ditch beginning at a point

on the southerly side of said river slightly below the Orodell overhead bridge running thence southeasterly a distance of approximately 50 feet to a point 20 feet north of the right of way of the Union Pacific Railroad Company, thence in an easterly direction parallel to said right of way 650 feet to a point on the east line of block 18, Town of Orodell, thence southeasterly along a line 12 feet from and parallel to the south line and the extension thereof, of block 73, Riverside Addition to La Grande, a distance of 725 feet, more or less, to a point 8 feet from and parallel to the south line and its extension of block 68, of said addition, thence east a distance of 275 feet, more or less, to a point 120 feet west and 8 feet south of the southeast corner of said block 68.

"NOW THEREFORE, in consideration of the requirements herein contained, to be performed by said company, the county court of Union County, Oregon, hereby grants to said company the right and permission to construct said ditch along, through, over or across any road, highway, street, alley, lane or other public property which may require in constructing said ditch in accordance with said survey or any reasonable modification thereof, and thereafter to convey water through said ditch, provided said company, at its own expense, construct and maintain all necessary culverts, bridges or other aqueducts made necessary by the construction of said ditch through, over or across any such road, highway, street, alley or lane."

It should be observed that block 10, Town of Orodell, referred to in the description in the permit, was part of a townsite, the plat of which has since been vacated. We are unable to determine from the record the exact location of this now nonexistent block with reference to plaintiffs' land. It is not disputed, however, that the location described in the permit lies somewhere between the Union Pacific right of way and

plaintiffs' southwesterly line. The defendant has pleaded the permit as the consent given by the county for the maintenance of its ditch in the county road "if any part of said road is inside of defendant's right of way". We think that the evidence shows that defendant relied on the permit as its authority for locating the ditch where it is. In reading the testimony to which we shall refer, it should be borne in mind that the witnesses, in using such expressions as "alongside the road" and "between the road and the fence" were obviously referring to the improved portion of the road.

Royal Frank Tyler, a director of the defendant company, who represented it in the negotiations with the county court respecting the relocation of the ditch, gave a pretrial deposition in which, while he would not admit that he intended to put the ditch in the county road, he did testify as follows:

"Q You talked to the County Commissioners with reference to permission to put your ditch along the road?

"A Yes, sir.

"Q You did get permission to put the ditch along the road, did you not?

*　*　*　*　*

"A Well, we got permission to cross the road, and as Mr. Cochran states, there was a contract drawn up with the County, that we should put a permanent crossing across the road.

"Q You didn't intend to go on anybody's land without permission, did you, Frank?

"A Sir?

"Q You didn't intend to put the ditch on anybody's land without permission, did you?

*　*　*　*　*

"A Well, a bunch of us went up and looked the ground over, there, and said it seemed to be an

extra wide road, and we could put it on the side next to Bushnell's land [referring to the then owner of plaintiffs' land].

"Q There was plenty of room for it alongside the road?

"A Yes.

"Q And that would avoid the necessity of going upon private land, wouldn't it?

\* \* \* \* \*

"A Yes, sir.

"Q It was your intention to avoid going on private land down there, wasn't it, along the road?

\* \* \* \* \*

"A The only private land we knew we was going on was what we bought from Mr. Carter. [The last answer refers to a right of way for its ditch which the defendant purchased from Carter, who owned land which lies west of the county road and extends from the river south to the railroad.]

\* \* \* \* \*

"Q (MR. CATER) Does the Irrigation Canal Company claim to own that land where the ditch is, alongside the road there, Frank?

"A Do they claim to own it?

"Q Yes.

"A Well, to my mind there is no question but what they owned it at the time Mr. Sweet bought it.

"Q You didn't claim any right of ownership when you first put the ditch there, did you? You just claimed permission from the County, which you had? Isn't that correct?

"A Well, that, I suppose; and the arrangements we made with Mr. Bushnell to fill a hole up.

"Q But you didn't have any arrangements with Mr. Bushnell that any part of that ditch was to be on his land, did you?

"A As I say, there was nothing at the time said about it. The stakes was there, and he knew where we was running it.

"Q When you put that ditch along the road there, you relied on permission from the County for your right to put it there, didn't you?

"A Not entirely, because we asked Mr. Bushnell about it.

"Q What did you ask Mr. Bushnell?

"A We talked it over with him, the three directors, and, I think, Si Perkins was up there, and several others; and he said it was perfectly satisfactory if we would put the dirt in that hole and fill the hole up for him."

On the trial Mr. Tyler gave the following testimony:

"Q Now then, did you take up the matter with the County Court relative to crossing the road?

"A Yes, sir.

"Q And in accordance with your interviews with them, did the County Court view the premises out there?

"A Yes, sir.

"Q And with reference to the part of the ditch that crossed the road, was the County Surveyor, Mr. Morgan, also present?

"A No; it wasn't Mr. Morgan. It was Mr. Mc-Lean—oh,—Morgan for the County? Yes.

"Q Mr. McLean made the survey?

"A Yes.

"Q Now then, was there anything said by the County Court as to the location of the ditch after it crossed the road?

"A Well, the sticks were all set when they were out looking it over, and the agreement was that we was to tile it across the county road, and the sticks were down the side of the county road, and they said that was O.K. with them.

"Q Now then, after crossing the road, and on the east side of the road at that time, did you learn who owned that property in there?

"A We didn't learn definitely, no. I know I spoke about it, that that property was off of the

graveled road, or the road that was used, and looked more like a lawn than anything else and I didn't see why the ditch should bother the road.

"Q Whose property was that there?

"A There was nothing said by anyone at any time about whose property it was.

"Q Before getting the ditch finished, did you consult someone with regard to that property?

"A I talked with Mr. and Mrs. Bushnell.

"Q E. N. Bushnell?

"A Yes.

"Q The father and mother of Alfred J. Bushnell, who was just on the stand?

"A Yes. And as a courtesy, more than anything else I believe, and asked them if they objected to this ditch running along their property there; and they immediately replied no, 'If you will fill this hole up on our ground, we are perfectly pleased with it.' We was anxious to have a place to dump the dirt, and so we immediately told them we would be glad to do that, because we wanted a place to put the dirt.

\* \* \* \* \*

"Q (MR. CATER) When the ditch was placed there, and you were making the arrangements you have mentioned, Mr. Tyler, you supposed that the fence which was there, and still in the same place, you supposed that the fence was the boundary of Mr. Bushnell's land, didn't you?

\* \* \* \* \*

"A As I said before, I remember very definitely telling the County Court this road was extra wide there and seemed to be a boulevard on the side, and it didn't seem there should be any objection to the road to have the ditch down there.

"Q In the road?

"A Down on the boulevard. We didn't put it on the road. The graded road was out to the side

of it. That is what I told them. They immediately said 'You are probably right.' 'It is all right with us.' And Bushnell said 'Fill that hole there' and it would be all right to put it there. There was nothing said at the time whether it was a road or a boulevard, outside of the fact I mentioned it that way. The road was extra wide and I didn't see that the ditch would interfere with the road at all.

"Q  I would like an answer to my question.

\* \* \* \* \*

"A  Well, as was stated there, it never come up whether that was, but it was the supposition probably that it was, as I testified before, but the question of the boundary never come up, outside of what I have stated before.

\* \* \* \* \*

"Q  (MR. CATER) Mr. Tyler, when you came through Mr. Carter's land, did you get permission?

"A  Yes, sir. I didn't. I think Mr. Perkins was on the ditch at that time, and he made the arrangements with Carter.

"Q  Did you get anything in writing from him?

"A  I didn't. I think there was a deed made to the ditch company for it.''

■ The witness Morgan, who had been county engineer for Union County since 1922 and was also county surveyor and road master, and who made the survey of plaintiffs' land in April, 1946, as well as a map thereof which is in evidence, testified with reference to the southwesterly line of the property: "When I made the survey, it was my endeavor to run that portion of the line as near as I could determine on the edge of the county road right of way or the edge of the road right of way I should say.'' The line which he so ran was the line on which the plaintiffs' fence is located. Moreover, the description which he pre-

pared for the deed from Wise and wife to the plaintiffs concludes: "Being the same premises conveyed by L. J. Walls and Millie Walls, his wife, to Bernard W. Wise and Nancy G. Wise, his wife, by deed dated October 22nd, 1942." The Walls' deed describes the property as "bounded * * * on the south by old county road". While such a reference does not render it conclusive that it was the intention of the grantor to convey all of the premises included in the former deed (18 CJ 282, Deeds § 250), yet there is nothing in this record to indicate that the reference did not mean exactly what it said.

At the time of the ineffectual proceedings for location of the road, and for many years thereafter during the period of use of the road by the public, the statute provided: "All county roads shall be sixty feet in width, unless the county court shall, upon the prayer of the petitioners for the same, determine on a different width, not less than forty feet nor more than eighty feet in width." § 4790 B & C. Until 1931 the standard width of 60 feet continued in effect, though changes were made in the maximum and minimum widths allowable upon prayer of the petitioners. See § 6293, LOL; § 4539, Oregon Laws (1920); § 44-1305, Oregon Code Annotated (1930). By ch 326, Oregon Laws 1931, the county court was given discretion to fix the width, which must be not less than 30 feet; and ever since then the county court has had this power with certain changes respecting the minimum width allowable. See § 100-1205, OCLA, and subsequent amendments thereof, ch 498, Oregon Laws 1947, ch 132, Oregon Laws 1951.

■■ The factors to be taken into consideration in determining the width of a highway established by

prescription were thus delineated in the opinion in the Bayard case:

> "* * * As a general rule, when the highway depends solely for its establishment upon adverse and continuous user by the general public, its width and extent of servitude are measured and determined by the character and extent of the user, for the easement cannot, upon principle or authority, be broader than the user [citing authorities]. Other conditions, however, may be effective to extend the exterior limits beyond the thread or course of actual travel, as where inclosures may have been permanently maintained by persons affected with reference to the highway, or the use is referable to a survey and plat recognized and adopted by owners of lands over which the way extends, or was under color of ineffectual proceedings to establish a legal road under the statute: Whitesides v. Green, 13 Utah, 34 (57 Am. St. Rep. 740, 44 Pac. 1032); Pillsbury v. Brown, 82 Me. 450 (19 Atl. 858, 9 L.R.A. 94); Sprague v. Waite, 17 Pick. 309; Bartlee v. Beardmore, 77 Wis. 356 (46 N. W. 494). Even where the highway is founded solely upon user, its width or extent of servitude is usually a question of fact for the jury. It would seem that it ought not, where the topography of the locality will permit, to be confined exclusively to the beaten track or thread of actual travel, because of the exigency that experience has shown for the passing and repassing of those in the use of it." 38 Or 446, 447.

■ In *City of Newberg v. Kienle*, 60 Or 486, 489, 120 P 3, this court approved the following from *Washington Borough v. Steiner*, 25 Pa Super Ct 392:

> "Where the right to a public highway is acquired by adverse user, an important element in determining the width thereof is the recognition of the limits of the way by the owners whose lands front thereon, as indicated by the monuments and

fences which they themselves place upon the ground, and the lines which they fix for the same in making conveyances of their property."

See to the same effect *Hoban v. Bucklin,* 88 NH 73 80, 184 A 362, 186 A 8; *Geer v. Chapin,* 163 Ill App 654, 659, 660; *Whitesides v. Green,* 13 Utah 341, 44 P 1032, 57 Am St Rep 740; *Burrows v. Guest,* 5 Utah 91, 12 P 847; 39 CJS 939, Highways § 20.

"* * * a deed between third parties referring to the way has likewise been held competent 'upon the question of the location and existence of the way, as a matter of public and general interest upon which reputation is admissible.'" 1 Elliott, Roads and Streets (4th ed) 242, § 198.

In *Hoban v. Bucklin* the court said:

"* * * The erection of a fence or wall as a permanent structure along the side of a wrought road is more probably than not intended to mark the line separating highway use from private occupancy and possession, in the absence of evidence that it was not thus intended. As physical barriers such structures, especially stone walls apparently designed as permanent boundaries, normally denote separation and distinction of use, and are notice of the line to which use is made." 88 NH 80.

The usual width of highways in the locality is a pertinent factor. *Whitesides v. Green,* supra; *Town of Randall v. Rovelstad,* 105 Wis 410, 430, 81 NW 819; *Bartlett v. Beardmore,* 77 Wis 356, 46 NW 494, 496.

"* * * Declarations of the owner of the land over which the road runs, or of the public authorities, tending to show that it is or is not a highway, are admissible as are also acts of the public authorities in working or otherwise recognizing the highway, in allowing a road tax to be worked out on the road in question, or in refusing to assess the

land for taxation. Evidence may be given that it is the general understanding in the community that the locus in quo is a highway.'' 39 CJS 943, Highways § 23.

See, also, 29 CJ 392, Highways § 28; *Parkey v. Galloway,* 147 Mich 693, 111 NW 348; *Richardson v. State,* 109 Tex Cr Rep 403, 5 SW2d 141.

■ The evidence in this case presents a number of relevant facts which convince us that the county road and the southwesterly boundary of plaintiffs' land are contiguous. These facts include the deeds so describing the property, the maintenance of the line fence for so many years, and the fact that the standard width of a county road was 60 feet. In addition the county court, in its dealings with the defendant, asserted its jurisdiction over the way in dispute and the defendant recognized its authority in that regard. Before the defendant built its ditch on the property of Mr. Carter it bought a right of way from him and received a deed to it. It did not even inquire, however, as to the ownership of the land lying between plaintiffs' fence and the improved portion of the road, but evidently assumed that it was public property, and, so believing, asked permission of the county authorities to locate its ditch there. This permission was granted both orally, and, as we think, by the written consent which is in evidence. We do not accept the witness Tyler's version of the arrangement for disposal of the dirt excavated from the ditch. It is quite different from that given by another witness, Alfred J. Bushnell, who was called by the defendant to testify on this subject. He is the son of E. N. and Lizzie Bushnell, owners of the property in 1937, and, as he stated, was at the time ''more or less partners'' with his father. He was present when the arrange-

ment was made, and testified that there was a big hole on his father's land, that the representatives of the defendant asked permission to put the dirt in the hole, that this was considered to be "a favor to both of us"—that is, to his father and the defendant—, and that neither he nor his father gave anything for the dirt. We think this testimony is to be preferred to Tyler's, not only because it comes from a disinterested source, but also because it is more reasonable and probable, since the defendant knew how to obtain a right of way over private property, and, moreover, in its own view of the matter, had already acquired from the county all the legal authority to build its ditch that it needed. That being so, why should it have bargained with Bushnell for a right of way? We think the agreement was simply one under which the defendant got rid of the dirt and Bushnell got the hole in his land filled.

Our conclusion from the evidence is that defendant's ditch is in the county road and that plaintiffs' land adjoins the county road. They are, therefore, abutting owners with the right of access to the highway, which is cut off as long as defendant maintains its irrigation ditch as an open ditch. The plaintiff, Walter Sweet, operates on the land a slaughter house and meat packing and processing plant, and he and his employees and customers are denied the use of the highway as a means of access to and from his place of business.

It seems to be the view of counsel for the defendant that even though plaintiffs' land adjoins the highway, still they are not abutting owners with the rights pertaining to such a status. Counsel argue that under the cases of *Jones v. Teller,* 65 Or 328, 133 P 354, and *Lankin v. Terwilliger,* 22 Or 97, 29 P 268, the plaintiffs

"got no title to the land upon which the respondent's irrigation ditch is located and (plaintiffs') land does not abut upon the county road." It was held in those cases that where land is described in a deed by metes and bounds, and the deed contains references to a road or street "for the purpose of description, as any mark or monument might have been referred to, and with no intention of making it the actual boundary of the land, unless it should be coincident with the description as given in the deeds", such a description of the granted premises does not convey an easement in an adjoining highway. 22 Or 102. Under this doctrine it was decided in the Lankin case that a deed containing such a description did not create an easement in a county road referred to, and therefore that when the road was vacated the land covered by it reverted to the grantor. In *Jones v. Teller* such a description was relied on by the grantee as evidence of the dedication of a street, but the contention was rejected on the authority of the Lankin case. See 2 Elliott, Roads and Streets (4th ed) 1202, § 916, which cites the Lankin case (note 8, p. 1203) for the proposition that a deed containing such a description shows the intention of the owner to exclude his interest in the highway. We are satisfied that that is all the case stands for and that neither it nor *Jones v. Teller* bears upon the present case.

We are not concerned here with the question whether the deed of Wise and wife to the plaintiffs conveyed to them an interest in the county road. Plaintiffs' rights do not depend on any such consideration, but upon the fact that they are abutting owners. That term, when used in relation to highways, "ordinarily refers to one whose land actually adjoins the way". 25 Am Jur 448, Highways § 153. It is established law

in this state that an abutting owner is entitled to the use of the highway in front of his premises to its full width as a means of ingress and egress and for light and air, and this right is as much property as the soil within the boundaries of his lot; and, therefore, any impairment of this right or interference with it caused by the use of the highway for other than legitimate highway purposes is a taking within the meaning of the constitution, whether the fee of the highway is in the owner or not. *Kurtz v. Southern Pacific Co.*, 80 Or 213, 223, 155 P 367, 156 P 794; *Willamette Iron and Steel Works v. Oregon Railway and Navigation Co.*, 26 Or 224, 228, 37 P 1016, 46 Am St Rep 620; *McQuaid v. Portland & Vancouver Railway Co.*, 18 Or 237, 245-248, 22 P 899. See, also, 2 Elliott, op. cit., 1158, § 885; 25 Am Jur 448, Highways § 154.

We do not understand that these decisions are over-ruled or their authority impaired by *Barrett v. Union Bridge Co.*, 117 Or 220, 243 P 93, 45 ALR 521, and *Brand v. Multnomah County*, 38 Or 79, 60 P 390, 62 P 209, 84 Am St Rep 772, 50 LRA 389. Both these cases involve the question whether a change of grade of a street in connection with the building of a bridge under public authority constituted a new servitude and a "taking" within the meaning of the constitution. In *Brand v. Multnomah County*, Mr. Justice WOLVERTON, speaking for the court, pointed out the distinction between that kind of a case and the Willamette Iron Works case, saying that in the latter "the approach was constructed without pretense of a grant of authority to change the grade of the street; nor did it, or the bridge to which it was joined, form any part of, or an extension of, any public highway." 38 Or 97.

Under our decisions and the law generally an open ditch along a public highway is a purpresture or

public nuisance. *McGowan v. City of Burns,* 172 Or 63, 74, 137 P2d 994, 139 P2d 785; *Town of Gaston v. Thompson,* 89 Or 412, 420, 174 P 717; *Savage v. City of Salem,* 23 Or 381, 383, 31 P 832, 37 Am St Rep 688, 24 LRA 787; 1 Wood on Nuisances (3d ed) 34, § 14. Even though it were to be conceded that defendant thus occupied the road by lawfully constituted authority, "yet it invades the right of an abutting owner, and is an appropriation of the property of such owner without compensation, which is beyond the power of the legislature or municipality, or both, constitutionally, to authorize or sanction." *Willamette Iron and Steel Works v. Oregon Railway and Navigation Co.,* supra, 26 Or 232.

■ Maintenance of the ditch cannot be justified, as counsel for defendant would have us do, as a public use. The same plea was advanced by the railway company in the Willamette Iron and Steel Works case, but the court said that, while it might be conceded that the interests of Portland and the public at large were promoted by the appropriation of the street to the purposes of an approach to defendant's bridge, it did not follow that the burden of such a public improvement could rightfully be cast upon the plaintiff by appropriating its property for the public benefit without compensation. (26 Or 230.)

Certain language in *Savage v. City of Salem,* supra, relied on by defendant as supporting its position, cannot be used for that purpose when properly understood and considered in the context of the case. The language is as follows:

"* * * it now seems settled that municipal authorities which possess under their charters general control over the streets, have the power to and may authorize and render lawful obstructions

and erections therein for a public purpose, which otherwise would be deemed nuisances, on the ground that such erections or structures are merely putting the street to a new and improved use, as demanded and required by the necessities of the times and the modern conveniences and appliances." 23 Or 383.

The case holds that water tanks erected and maintained on certain of the city streets were not a nuisance per se and that, under the evidence, it was a question for the jury whether they were a nuisance in fact. The plaintiff had a contract with the city to sprinkle the streets, and the tanks were erected by him by authority of the common council for the purpose of supplying his street sprinkling wagons. They were removed by the city over plaintiff's objection, and he brought an action to recover damages for such removal. This court, in affirming a judgment for the plaintiff, took note of the fact that the case did not involve any question as to the right or remedy of an abutting property owner. That is one point of distinction from the present case, and another and very significant difference is that the water tanks were authorized by a municipal authority having under its charter general control over the streets for the purpose of subserving a public purpose, namely, sprinkling the city streets. The sort of obstruction to which the court referred in the sentence relied on by counsel is explained in the next sentence, which reads as follows:

"* * * It is upon this principle that the right to grant franchises authorizing the use of the streets for water and gas pipes, for the construction and operation of street railways, the erection of water hydrants and lamp posts, of telegraph, telephone, electric-light, and railway poles, and similar structures, is maintained and now generally recognized and upheld by the courts: 2 Dillon, Mun. Corp.

§§ 657-697; Keasby, Electric Wires, 86, 89; Thompson, Electricity, §§ 26, 28." 23 Or 383.

The court proceeded:

"* * * Since a municipal corporation holds its control and power over the streets in trust for the public, it has no authority to authorize or permit private persons or corporations to erect or maintain permanent obstructions therein for purely private purposes."

It is, of course, manifest that this is exactly what the county has permitted to be done in this case; and there is nothing in either the decision of the Savage case, or in any statement of the law in the opinion therein, which gives any support to defendant's contention.

*Baines v. Marshfield & Sub. R. Co.,* 62 Or 510, 124 P 672, is like *Savage v. Salem,* in that it involves the maintenance of a railroad in a public street pursuant to what was claimed to be a franchise granted by the city pursuant to legislative authority. Under the evidence it was held that the railroad was a mere private enterprise and not designed to subserve a public purpose. There was only an occasional interference with plaintiffs' right of access to their property; nevertheless, the railroad was held to be a public nuisance and its maintenance in the street enjoined. The case is not authority for the proposition that a corporation, even though acting under lawful authority and serving a public purpose, may completely cut off an abutting owner's right of ingress and egress without paying just compensation. That a railroad company may not do so is clear. 2 Elliott, op. cit., § 928. We see no reason for a different rule in the case of an irrigation company, especially as the legislature has granted such companies no right to occupy a county road or highway

longitudinally, otherwise than by the exercise of the power of eminent domain. We say this with full realization of the importance of irrigation to the eastern part of Oregon.

The defendant calls our attention to certain statutes which apparently are claimed to be authority for the county court's action and for its own right to maintain its open ditch in the road. One of these is § 100-2703, OCLA, which provides in part that any person constructing a ditch *across* a public highway shall put over such ditch where it crosses the highway a bridge or culvert of such width and material as the county court shall order. This statute does not aid the defendant. We may infer from it the authority for passing laterally over a highway, but not for going along it longitudinally. *Town of Gaston v. Thompson,* supra. The other statutes relied on are §§ 12-101, 102, 104 and 105, OCLA. The section last mentioned authorizes a corporation to make a public highway part of its corporate road. See *Douglas County Road Company v. Canyonville and Galesville Road Company,* 8 Or 102, 107. It has no bearing on any question in this case. The other sections authorize corporations of various types, including those organized for irrigation purposes, to acquire rights of way for canals and ditches by eminent domain proceedings. It is provided, among other things, that the corporation may, by agreement with the county court, appropriate a county road or highway and in lieu thereof condemn contiguous or adjacent property and construct a similar road or highway. As the defendant did not resort to condemnation proceedings, we are unable to perceive any basis for this contention.

In our opinion, an attempted authorization by the county court to a private corporation to maintain an

open irrigation ditch in a public highway is a usurpation of power. The very statutes upon which counsel rely, and to which we have just referred, by clear implication negative the existence of any such power.

Other questions in the case relate to the defenses of adverse possession, estoppel and abandonment.

As against the county the defense of adverse possession is, of course, not available in view of the provisions of § 100-3102, OCLA, which expressly inhibit that method of acquiring title to lands included in public roads. This has been the statutory law of this state since 1895. See Laws 1895, p. 57, §§ 1 and 2. And, since, as we have held, defendant's open ditch in the highway is a public nuisance, the plaintiffs have not lost their right of ingress and egress through lapse of time, for, as Mr. Justice RAND said in *Laurance v. Tucker*, 160 Or 474, 479, 85 P2d 374, "the statute of limitations does not run against a public nuisance no matter how long continued." See, also, *City of Molalla v. Coover*, 192 Or 233, 250, 235 P2d 142; *Lowell v. Pendleton Auto Co.*, 123 Or 383, 402, 261 P 415; *McGowan v. City of Burns*, supra, 172 Or 76; 2 Wood on Nuisances (3d ed) 936, § 727.

The defense of estoppel is based on the alleged agreement with Bushnell for disposal of dirt from the excavation and the acquiesence of plaintiffs and its predecessors in interest in the maintenance of the ditch. We have already held that the evidence does not support the claim that such an agreement was made. Decisions from other jurisdictions relied on by the defendant in this connection are *Burkham v. Ohio & M. Ry. Co.*, 122 Ind 344, 23 NE 799; *Mahoney Land Co. v. Cayuga Investment Co.*, 88 Wash 529, 153 P 308; *Woodard v. West Side Mill Co.*, 43 Wash 308, 86 P 579; *Ruthven v. Farmers Co-op.*, 140 Ia 570, 118 NW 915.

But these are not cases involving public nuisances, a distinction, it may be noted, which was particularly pointed out in *Woodard v. West Side Mill Co.* and *Ruthven v. Farmers Co-op.*, supra. For this and other reasons not necessary to be stated, the authorities cited are not applicable here.

Defendant asserts that if the *locus in quo* was ever a county road that portion of it occupied by defendant's irrigation ditch has reverted to private ownership through failure of the county over a long period of years to improve it and open it up to public travel. *Trullinger v. Howe,* 53 Or 219, 97 P 548, 99 P 800, and *Bayard v. Standard Oil Co.*, supra, are cited. In the former case, which involved a navigable stream, it was remarked arguendo, "It is true it has been held that the right of the public to a highway on land may be lost by non-user." 53 Or 226, citing the Bayard case and *Grady v. Dundon,* 30 Or 333, 47 P 915. In the Bayard case the court, in reversing a judgment for the plaintiffs, observed that there was evidence that the thread of travel had been diverted from the old highway and that there had been a complete non-user of a certain portion of the old way for more than 10 years, and that if these facts should be established by the proof the jury would be warranted in finding that there was or had been to that extent an abandonment of the old way by non-user. 38 Or 451. *Grady v. Dundon,* supra, dealt with events which occurred before the 1895 enactment providing that title to property in a county road could not be acquired by adverse possession. The court held that the plaintiff, who had erected improvements on the property claimed to be a highway, was the rightful owner thereof by adverse possession and that there had never been such a use of the premises as to indicate that a public road had ever been

established there. Respecting this subject it is said in 2 Elliott, op. cit., 1668, § 1172:

> " 'Once a highway always a highway,' is an old maxim of the common law to which we have often referred, and so far as concerns the right of abutters, or others occupying a similar position, who have lawfully and in good faith invested money or obtained property interests in the just expectation of the continued existence of the highway, the maxim still holds good."

The author continues:

> "If it is shown that a highway was once laid out pursuant to law, or created by dedication, the burden of showing a discontinuance, abandonment or vacation is upon the party who asserts that the public and the abutting owners have lost or surrendered their rights. In the absence of satisfactory evidence of discontinuance, vacation or abandonment, the presumption is in favor of the continuance of the highway with the principal and incidental rights attached to it. Not only is this so by the force of the maxim we have quoted, but it is so by force of the elementary rule that 'a thing shown to exist is presumed to continue until the contrary is made to appear.' In a comparatively recent case it is said: 'An intention to abandon must be established by the evidence, and such intention must be clearly and satisfactorily proved.' " 1669, § 1173.

> "It is generally held that mere nonuser does not constitute an abandonment; but there are some decisions that seem to take a different view. In most of such cases, however, an intent to abandon was shown or there was something more than mere nonuser." 1670, § 1174.

◼ We find no decision of this court holding that mere non-user of a highway by itself is sufficient to show abandonment. On the contrary, we have said, "A municipal corporation is under no obligation to open a

dedicated street until its use is deemed necessary by the common council." *Barton v. Portland,* 74 Or 75, 79, 144 P 1146. See, also, *Oliver v. Synhorst,* 58 Or 582, 584, 109 P 762, 115 P 594. There are numerous decisions of this court (some of the earlier ones being cited by defendant) in which the question of abandonment is mixed up with estoppel against the municipal authorities arising out of either affirmative action sanctioning, or passive acquiescence in, the occupation of the highway by abutting owners of permanent and valuable improvements. These cases are all analyzed in the able opinion of Mr. Justice BRAND in *City of Molalla v. Coover,* supra, where the claim of the abutting owner was rejected. The opinion re-emphasizes the holdings of this court that a public or governmental corporation is not estopped by the acquiescence of its officers when they exceed their powers (see *Cabell v. Cottage Grove,* 170 Or 256, 284, 130 P2d 1013, 144 ALR 286; *Tuttle v. Beem,* 144 Or 145, 157, 24 P2d 12; *Mutual Irrigation Co. v. Baker City,* 58 Or 306, 110 P 392, 113 P 9), and overrules the prior decisions of this court which hold "that a city will be estopped to open a street by reason of its *tacit acquiescence* in the construction therein of permanent and valuable improvements by persons who knew or should have known that the erections were within the lines of dedicated though unopened streets" (italics added). The opinion, while not subscribing expressly to Elliott's criticism of the application of the doctrine of equitable estoppel by this and other courts to cases where there was nothing more than passive acquiescence on the part of governmental authorities, may be said to be founded in adherence to the fundamental theory of the doctrine as expounded by that author, that there can be no estoppel where the knowledge of both parties is equal and noth-

ing is done by the one to mislead the other. 2 Elliott, op. cit., 1697, § 1189.

■ In the present case not only is there no evidence that the public authorities intended to abandon the unimproved portion of the county road as a public highway, but the permit given to the defendant to construct its ditch in the road demonstrates the contrary. The permit was granted subject to the condition that the defendant company "at its own expense, construct and maintain all necessary culverts, bridges or other aqueducts made necessary by the construction of said ditch through, over or across any such road, highway, street, alley or lane." The defendant, as the evidence shows, had actual knowledge of the existence of the road and was charged with knowledge of the rights of the public and abutting owners. The terms of the county court's permit evinced its purpose to exercise a continuing jurisdiction over the part of the road in which the ditch was located. So far from misleading the defendant, the county court's action constituted notice to it of affirmative assertion of the county's rights. We conclude that under the evidence and the law there would be no justification for holding that the part of the county road in question has been abandoned.

■ The right of an abutting owner to the remedy of injunction in circumstances such as are here present is clearly established. *Lowell v. Pendleton Auto Co.,* supra; *Tooze v. Willamette Valley S. Ry. Co.,* 77 Or 157, 162, 150 P 252; *Baines v. Marshfield & Sub. R. Co.,* supra, 62 Or 515; *Willamette Iron and Steel Works v. Oregon Railway and Navigation Co.,* supra, 26 Or 233. The remedy can be granted in this case without undue hardship to the defendant. Plaintiffs do not ask that

the defendant be compelled to abandon use of the ditch for conveying water for irrigation purposes, but only, in the language of the prayer,

"That the defendant be enjoined from maintaining said ditch in the public highway adjacent to the land of the plaintiff as an open ditch and an impassable barrier, and that the defendant be required to install culvert to convey the water in said ditch and to cover and fill the same level with the surface of the ground so that the plaintiff may have ingress and egress to and from his premises along the full length of that portion of the said public road to which the plaintiffs' land is adjacent".

Notwithstanding any opinion expressed by us as to the want of legal authority to maintain the ditch at all, it is unnecessary, in making provision for an injunction, to go beyond what the plaintiffs seek. An abutting owner, however, "is not necessarily entitled as against the public to access to his land at all points and it is held that it is sufficient if he has free and convenient access to his land and improvements thereon even though not at all points where it abuts upon the highway." 2 Elliott, op. cit., 1153, § 882. See, also, *Genazzi v. Marin County*, 88 Cal App 545, 263 P 825; *State Highway Board v. Baxter*, 167 Ga 124, 144 SE 796; 39 CJS 1081, Highways § 141. Consequently, the decree in this case will go no farther than to require the defendant to install in its ditch such culverts, bridges or other structures as will afford to the plaintiffs free and convenient access to their property, and in particular to that portion of it on which their business is conducted to the end that their means of ingress and egress shall not be substantially interfered with. It may be that the parties will agree upon the provisions of the decree in that regard. Otherwise, it will be

necessary for the circuit court to hold a further hearing to enable it to fix the terms of the decree.

It follows that the decree of the circuit court is reversed and the cause remanded for further proceedings in conformity to this opinion.

PETITION FOR REHEARING

*Cochran & Eberhard,* of La Grande, for the motion. *Charles R. Cater,* of La Grande, contra.

Before BRAND,* Chief Justice, and ROSSMAN, LUSK, LATOURETTE** and WARNER, Justices.

LUSK, J.

The petition for rehearing presents nothing that we have not heretofore considered and discussed, except a contention that, to quote from the brief, "The Court's opinion gives a road 80 feet wide without any proof of such a road being necessary or required." This assertion is based on what, in our opinion, is an unwarranted assumption that the southerly boundary of the road is the northerly boundary of the Union Pacific right of way, and that assumption in turn derives from the description in the ineffectual proceedings to establish a road. For reasons which it is unnecessary to repeat we rejected the plaintiff's contention that the width of the road could be determined by reference to those proceedings. That being so, we are unable to see how they can have evidentiary value for any purpose. Assuming, however, that resort may be had to the proceedings for the purpose sug-

---

* Chief justice when this case was argued.
** Chief Justice when this opinion was rendered.

gested by counsel, we will consider counsel's contention that the description in the petition fixes the southerly boundary of the road. The petition describes a proposed road as "running along the north side of the right of way of the Oregon Railway and Navigation Company." This, it is said, means that the road was to be contiguous with the North boundary of the right of way. But this is not necessarily so, and in this instance the construction suggested would be unreasonable.

The word "along" is defined in Funk & Wagnall's Dictionary as "At points extending through or over the length (of anything); by the side; near". The meaning of the word must be determined from the context, and it does not necessarily imply contact. *Watts v. City of Winfield,* 101 Kan 470, 168 P 319. See, also, *Williams v. Routt County,* 37 Colo 55, 84 P 1109; *Pratt v. Atlantic and St. Lawrence Railroad Co.,* 42 Me 579, 585; *People v. Astle,* 337 Ill 253, 256, 169 NE 185.

For a portion of its length opposite the plaintiffs' property the railroad right of way is 60 feet in width. It then widens out to 100 feet, and the north line becomes 20 feet closer to plaintiffs' land than is the case with the remainder of the right of way to the west. According to the testimony of the witness McLain, an engineer who prepared two of the maps in evidence, this additional 20 feet was "bought after, in later years". He did not state when it was bought, and there is nothing to indicate whether it was before or after the abortive proceedings were commenced. But, whatever may be the fact about that, it is unreasonable to suppose that the petitioners intended the road to adjoin the right of way as it is now because the line of the road would have then proceeded in a southeast-

erly direction along the railroad right of way some 300 or 400 feet, then turn at left angles to the northeast for a distance of 20 feet, and then, turning again at right angles, continue in a southeasterly direction. It would be equally unreasonable to say that, if the railroad right of way at the time of the attempted establishment of the road was 60 feet in width throughout its entire length, a county road was established which adjoins the railroad's right of way because, if that be the case, it would follow that the railroad company is now occupying 20 feet of the county road. We conclude, therefore, that the words "along the north side of the right of way" in this instance mean *near* the right of way.

Moreover, the boundary of the road, had one been established pursuant to the ineffectual proceedings, would not necessarily have been the exact line referred to in the petition, for the viewers, had there been any, might have made reasonable deviations so long as they stayed within the course specified in the petition. *Ames v. Union County,* 17 Or 600, 605, 22 P 118. But, since there were no viewers and the proceedings were without legal effect for any purpose, the entire discussion would seem to be purely academic.

■ Our holding is that the road is 60 feet in width, its northerly boundary being contiguous with the southerly boundary of plaintiff's land.

Counsel call our attention to error in the opinion in referring to "block 10, Town of Orodell" (see 254 P2d 700, at p. 707). We intended to write "Block 18" in accordance with the description in the county court's permit issued to the defendant.

We are not persuaded that we should change the views of this case heretofore expressed, and the petition is therefore denied.